Date signed August 11, 2009



*James F. Schneider*
**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| PAUL McCLENDON and CAPRI McCLENDON, | * | Case No. 08-17058-JS |
| | * | Chapter 7 |
| Debtors | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

| | | |
|---|---|---|
| VINAY GULATI, | * | |
| Plaintiff | * | |
| v. | * | Adv. Proc. No. 08-0592-JS |
| PAUL McCLENDON and CAPRI McCLENDON, | * | |
| Defendants | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

***MEMORANDUM OPINION DETERMINING DEBT TO BE DISCHARGEABLE***

The instant complaint seeks the nondischargeability of debt related to the breach of a so-called "equity participation contract" between the parties. The contract called for Vinay Gulati ("Gulati" or "the plaintiff") to lend $23,000 to Paul and Capri McClendon ("the McClendons" or "the defendants") for the purchase of a residence, purportedly in exchange for a 50% interest in whatever equity would exist in the residence at a future sale. The contract was written without the assistance of counsel and was not honored when the McClendons later sold the residence. The plaintiff brought suit against the debtors in the state court in which he alleged fraud and breach of contract and obtained a judgment in the amount of $132,990.61. The issue is whether the judgment is nondischargeable in bankruptcy pursuant to Section 523(a)(2), (a)(4) and/or (a)(6) of the Bankruptcy Code. For the following reasons, the judgment will be determined to be dischargeable.

## FINDINGS OF FACT

1. In 2003, the McClendons met Gulati when he conducted a financial seminar at the church at which Mr. McClendon was a pastor.

2. Gulati is an experienced real estate investor and broker. He owned and operated a real estate brokerage known as Dream Realty, Inc. ("Dream"). He testified at trial that he has entered into approximately 150 real estate transactions through Dream, including approximately five equity participation contracts, and that the

contract with the defendants was only the second equity participation contract he executed. He further testified that he owned multiple investment properties that he rented to tenants.

3.   When the McClendons met Gulati, they were living in a home in Germantown, Maryland ("the Germantown Property"). They had fallen behind on their mortgage payments and their homeowners' association fees, but they were able to catch up through loans from family members, friends and acquaintances.

4.   The McClendons informed Gulati that Mr. McClendon was employed by Kaiser Permanente and as a pastor, and that Mrs. McClendon was employed by the Food and Drug Administration. However, they testified that they did not inform him regarding (1) Mr. McClendon's 1991 conviction for credit card fraud, (2) several judgments outstanding against them, or (3) several prior foreclosures on property that they had formerly owned. Gulati did not perform any due diligence regarding the financial background of the McClendons, and explained at trial that he was "not a private investigator."

5.   The McClendons contacted Gulati initially about a rental property that he had advertised. Gulati showed them the property and persuaded them that it would be in their best interests to purchase rather than rent. Because they could not afford to pay the purchase price of the property, Gulati showed other properties to them.

3

6.  The McClendons eventually decided to purchase a property that Gulati showed them in Laurel, Maryland ("the Laurel Property").[1]

7.  Because the McClendons were not able to make a down payment on the Laurel Property, they entered into a "contract" with Gulati dated March 31, 2003. Plaintiff's Ex. No. 8.  A revised equity participation agreement, dated April 15, 2003, provided, as follows:

### Contract and Agreement

(1) Parties to the Contract: This is an equity-sharing/equity participation contract and agreement.

This contract and agreement is entered into on March 31, 2003, between Pastor Paul McClendon & Mrs. Capri McClendon, the owner-occupants to be of Lot #5C, Timber Oak (Stone Lake Advertised Subdivision), more commonly known as 8705 Timber Oak, Laurel, MD; and Mr. Vinay Gulati the equity share partner, hereinafter called PM, CM and VG respectively.

(2)  Disclosures as required by State of Maryland Law: VG wishes to disclose herein in writing that VG is a Real Estate Broker in the State of Maryland.  This disclosure is required under the laws of the State of

---

[1]Because he was concerned that the property, a highly desirable end unit in a seller's real estate market, would sell quickly, Gulati issued a check on March 28, 2003, in the amount of $500 to the seller, a developer named Goodier Builders at Stone Lake, LLC ("Goodier"), to hold the lot for seven days.  Plaintiff's Ex. No. 10.  The check was not deposited.  On March 31, 2003, Gulati issued another check in the amount of $5000 to Goodier as a good faith deposit.  However, Goodier agreed not to deposit the check until the contract was signed, essentially waiting for the McClendons to be able to sell the Germantown Property.

4

Maryland.   VG is doing business as Dream Realty, Inc., a duly incorporated Company in the State of Maryland.

(3)  Property Description: PM, CM and VG are purchasing the afore-said property, Lot #5C, Timber Oak (Stone Lake Advertised Subdivision), more commonly known as 8705 Timber Oak, Laurel, MD, the near future.   Said property will be ready around June-July 2003.   This property is described as Lot #5C in the Howard County Records.

(4)  Occupants: PM & CM will be residing in the property.  The property shall be occupied ONLY by PM & CM.

(5)  Since, PM & CM will be the occupants of the property, all utilities, and the monthly HOA (Homeowners Association) fees will be paid by PM & CM.  VG shall not share in this monthly recurring expenditure.

(6)  Tax benefits of home-ownership: i.e. deductibility of mortgage loan interest and property taxes will belong ENTIRELY to PM & CM.

(7)  Recorded Title: Recorded title to the property will be held ONLY in the names of PM & CM.

(8)  PM & CM shall pay the closing costs associated with the loan, and the purchase of the house.

(9)  Down-Payment: VG will put 5% down-payment.  In addition, PM & CM may at THEIR discretion bring some more down-payment from their own side, IF they so wish & desire.

(10)   PM and CM, will sign a "Deed of Trust", with VG as the beneficiary.

(11)  There will be NO rental income to VG, as PM & CM will be living in this house, without paying any rental income to VG.

5

(12)  In lieu of VG foregoing the rental income from this property, VG will get 50% "equity" at time of sale.  PM & CM will write a check to VG for this amount from the sale proceeds of the house.

(13)  "Equity" is defined as the gross selling price of the house - the principal amount due from the "Payoff" statement at time of sale.

(14)  PM & CM can stay in the house as long as they want.  There is NO Limit as to the duration of stay of PM & CM in this house.

(15)  IF either party wants to sell out their share, then such share shall be offered to the other partner as a "buy-out" clause.  Value to be determined by an independent appraisal.

(16)  "Buy-outs", will be on the same term as a regular "sale" to an outside person.  Neither party can "force" or coerce the other party to invoke the "buyout" clause, i.e. the "buy-out" must be agreeable to both the parties.  In case either party died, then the interest of that party will be passed on to the heirs of the deceased party, through a will or a revocable living trust (QTIP: Qualified Terminable Interest Property) of that party.

(17)  Both the partners enter into this contract with good faith & intentions.  Errors and omissions can be remedied at a later point in time by both parties, in which case if both parties agree, then a new contract (Novation) will replace this existing contract.  IF either party objects to the change, if any, then such change shall not take place.

(18)  Since, the said property is located in Howard County, Maryland, this contract will be governed under the jurisdiction of the laws of the State of Maryland, with the District Court of Howard County as the judicial body in such an event.

(19)  HOWEVER, all parties agree to forego the expensive and time-consuming court litigation system.  Any disputes shall be resolved first through mediation; failing which through binding Arbitration.  By agreeing to Arbitration, all parties voluntarily agree to give up their legal

6

"due process" legal rights of the court litigation system as is guaranteed
in the U.S. constitution.

Revised equity participation contract, Plaintiff's Ex. No. 9.

8.  Gulati testified again and again that he performed no "due diligence" on the
financial condition of the McClendons and asserted that he relied on the fact that Mr.
McClendon was a pastor.  He also testified that he relied on "the builder," Goodier,
to investigate the McClendons' financial assets and liabilities.

9.  On April 25, 2003, the McClendons signed a contract to purchase the Laurel
Property from Goodier.  Plaintiff's Ex. No. 11.  The $5,000 check from Gulati to
Goodier for the down payment was deposited; the $500 check he put up to hold the
lot was returned to him.  His records reveal that the $5,000 check was "presented" on
May 6, 2003.  Plaintiff's Ex. No. 12.

10.  On July 18, 2003, the McClendons closed on the sale of their Germantown
Property.  They took $49,355 in cash from the closing.  Settlement sheet, line 603,
Plaintiff's Ex. No. 13.  For several months after the sale, they leased the Germantown
Property while they waited to close on the Laurel Property.

11.  On August 25, 2003, Gulati gave two checks to the McClendons to enable
them to go to settlement on the Laurel Property two days later on August 27, 2003.
The first check in the amount of $1,800 was a rent check from one of his tenants,

made payable on his instructions to the McClendons. The second check in the amount of $16,200 was issued directly from a joint account that Gulati maintained with his wife. Plaintiff's Ex. No. 14. Combined with the $5,000 down payment, the total amount that Gulati had thus far lent the McClendons was $23,000.

12. On August 27, 2003, settlement occurred on the purchase of the Laurel Property. Plaintiff's Ex. No. 15. The McClendons took title to the Laurel Property as tenants by the entireties.

13. The total purchase price of the Laurel property was $493,623.66, inclusive of fees, expenses and taxes. To finance the purchase, the McClendons obtained a first mortgage from JP Morgan Chase Bank, N.A., in the amount of $374,856, and a second mortgage from Wilshire Credit Corporation in the amount of $92,755.93. Combined with the $25,000 down payment and a $13,839 "seller contribution," the McClendons came away from the settlement table with more than $13,000 in cash and mortgage debt of approximately $466,000.[2]

14. The McClendons maintained regular monthly mortgage payments until November 2005, when they ceased making payments. Plaintiff's Ex. No. 21. They

---

[2]Line 201 of the settlement sheet indicated that they made a $25,000 down payment, $23,000 of which had been lent by Gulati. Furthermore, Line 303 indicated that they took from the settlement cash in hand in the amount $13,022.35.

8

also fell more than $12,000 behind on their homeowners' association fees.  Plaintiff's Ex. No. 19.

15.  The McClendons testified that their financial difficulties were partly caused by an automobile accident in which Mr. McClendon was involved, that caused him to lose his job.  Gulati testified that Mr. McClendon told him that he (Mr. McClendon) pretended to be disabled in order to receive government payments without working.  This statement was disputed by the McClendons.

16.  On or about March 15, 2006, the McClendons approached Gulati regarding their financial problems.  They told him that they were having difficulty in paying their credit card bills for Christmas gifts that Mr. McClendon had purchased for members of his congregation.  They also sought Gulati's assistance in selling the Laurel Property.

17.  Accordingly, on March 15, 2006, the parties entered into two contracts. The first contract involved a loan from Gulati to the McClendons in the amount of $4,500, at 9.85% interest, to be repaid upon the sale of the Laurel Property.  The contract provided, as follows:

### Contract and Agreement

(1) The net sales proceeds at the time of settlement, will be split half to Paul R. McClendon & Capri McClendon; and half to Vinay

Gulati, by Paul R. McClendon & Capri McClendon, by writing a check for 50% of the amount of the net sales proceeds check to Vinay Gulati.

(2) Paul R. McClendon & Capri McClendon are borrowing $4,500 from Vinay Gulati, which shall be repaid from the sale of the house (or the surplus left from the foreclosure sale, incase (sic) the property goes into foreclosure) @ 9.875% interest from March 14, 2006 through to date of payment.

This repayment of $ 4,500 with interest, @ 9.875%, will be paid by Paul R. McClendon & Capri McClendon from their part, i.e. from their half of the balance of the net sales proceeds check which they are left with after disbursing the funds to Vinay Gulati, as per Item # (1) above.

Contract, Plaintiff's Ex. No. 17.

18.  The second contract was a listing agreement whereby the McClendons agreed to hire Dream as a listing agent and pay 5% of the sales price of the Laurel Property to Dream.  Plaintiff's Ex. No. 16.  After an initial disagreement, the parties agreed to a listing price of $749,900, with the expectation that the Laurel Property would sell for significantly less.  The listing agreement provided that it would expire on December 31, 2006.

19.  At some point, the McClendons located a potential buyer for the Laurel Property and refused to pay Gulati the listing fee because they procured the buyer.  Gulati disagreed.  This dispute marked the beginning of the deterioration of the

relationship between the parties. However, the dispute was rendered moot when the potential buyer failed to qualify for financing.

20. On June 13, 2006, the McClendons filed a joint Chapter 13 bankruptcy petition in this Court, Case No. 06-13408-DK. They did not give notice to Gulati of the filing and he was not listed in their schedules either as a creditor or as a party to an executory contract.

21. Gulati located a purchaser for the Laurel Property who qualified for financing. On November 6, 2006, the McClendons went to closing with that buyer. Plaintiff's Ex. No. 18. The purchase price of the Laurel Property was $638,000. However, because of outstanding unpaid mortgage payments and homeowners' association fees, the McClendons owed at least $70,000 more at the time of sale than they owed when they purchased the Laurel Property. Regardless of this, they netted cash from the sale in the amount of $58,154.18. In its role as realtor, Dream received a commission from the sale proceeds in the amount of $15,950.[3]

---

[3]The sale was not brought to the attention of this Court or to the Chapter 13 trustee, or to any creditors of the McClendons, and therefore was conducted without court approval, as required by the Bankruptcy Code. Had such notice been given, the Court would have required distribution to joint creditors of the debtors, if any. The day after the debtors went to settlement, they filed a motion to dismiss the bankruptcy case, which the Court granted on September 12, 2006, without knowledge that an unauthorized sale had occurred. The propriety of that sale is not before the Court.

11

22.  The McClendons did not pay half of the equity from the proceeds of sale of the Laurel Property to Gulati as the equity participation contract provided.  Instead, they repaid debts to friends and family, purchased a used automobile and paid off the debt on another automobile.  At closing, they gave Gulati the choice of being paid either as the listing agent or as an equity participant, and stated to him that that was the only fair way to proceed.  However, they eventually paid him approximately $4,800 to satisfy the March 15, 2006 loan.[4]

23.  On November 13, 2006, without counsel, Gulati filed a lawsuit against the McClendons in the Circuit Court for Howard County, Maryland, styled *Gulati v. McClendon, et al.*, Case No. 13-C-06-67287CN.  Plaintiff's Ex. No. 1.  The complaint asserted only a cause of action for breach of contract.  On December 14, 2006, by counsel, Gulati filed a second amended complaint against the McClendons in which he alleged fraud and unjust enrichment.  Plaintiff's Ex. No. 4.  The amended complaint alleged fraud on two theories: (1) that the McClendons never intended to make any payment of the 50% equity interest; and (2) that they fraudulently concealed their past history of "foreclosures, debts, non-payments, and judgments entered against them."  Plaintiff's Ex. No. 4, ¶ 16.

---

[4]Gulati asserted that this amount was not enough to satisfy the loan.  The debtors disagreed. However, there is no assertion that this debt is nondischargeable in bankruptcy and thus any dispute regarding it is irrelevant.

24.  On December 26, 2006, the McClendons filed a one-page answer, *pro se*. Plaintiff's Ex. No. 2.  They asserted that the loan was a "con," and that the March 15, 2006 loan and listing agreement superseded the earlier equity participation agreement. After an attempt at mediation failed, a trial was held on January 2, 2008.

25.  At 10:15 on the morning of trial, Mr. McClendon telephoned the circuit court to request a postponement on the ground that he had been injured and needed Mrs. McClendon care for him.  The court denied the request and conducted a full evidentiary hearing on the second amended complaint in the McClendons' absence. At the conclusion of the trial, the circuit court entered an order of judgment against the McClendons, that stated, in pertinent part, as follows:

> 1.  By a preponderance of the evidence, the Plaintiff established each and every element of a claim for breach of contract and, as a result of the Defendants' breach of contract, the Plaintiff sustained $94,993.29 in damages.  Accordingly, judgment in the amount of $94, 993.29 was entered in favor of the Plaintiff against the Defendants, jointly and severally.

> 2.  In addition, by clear and convincing evidence, the Plaintiff established each and every element of a claim for fraud, as well as each and every element for a claim of concealment.  As a result thereof, the Court entered a judgment for punitive damages against the Defendants, jointly and severally, in the amount of $37,992.32.

> 3.  In addition, by a preponderance of the evidence, the Plaintiff established each and every element of a claim for unjust enrichment, as well as promissory estoppel.  Because the damages attributable to these

claims would be the same as that awarded for the Defendants' breach of contract, no further damages were awarded on those claims.

4.  In addition to these findings, the Court awarded $165 in costs, plus $100 for the Defendants' failure to appear for the November 13, 2007 Court ordered settlement/pre-trial conference.

Based on these findings, and as was set forth more fully on the record, on January 2, 2008, judgment is entered against Defendant Paul McClendon and Defendant Capri McClendon, jointly and severally, in the amount of $132,990.61; plus $265 in costs."

Judgment of the Circuit Court for Howard County, Plaintiff's Ex. No. 5.

26.  Thus, Gulati turned a $23,000 residential loan into a $133,000 judgment.

27.  On March 24, 2008, the McClendons, *pro se*, filed a motion to vacate the order of judgment.  On April 21, 2008, the circuit court denied the motion.

28.  On May 24, 2008, the McClendons filed the instant Chapter 7 bankruptcy petition in this Court.

29.  On July 31, 2008, Gulati filed the instant complaint against the debtors to have the judgment entered by the Circuit Court for Howard County determined to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6).

30.  On January 13, 2009, Gulati filed a motion for summary judgment to hold the judgment to be nondischargeable on the basis of collateral estoppel.  On February 18, 2009, a hearing was held on the motion, at which time the motion was denied.  On March 23, 2009, trial was held on the instant complaint.

14

## *CONCLUSIONS OF LAW*

### SUBJECT MATTER JURISDICTION AND VENUE

1.  This complaint to determine the nondischargeability of a debt is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(I), over which the bankruptcy court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1334.  Venue is appropriate pursuant to 28 U.S.C. § 1409.

2.  The complaint was brought pursuant to Section 523(a)(2), (a)(4) and (a)(6) of the Bankruptcy Code.[5]

---

[5]Section 523(a)(2), (a)(4) and (a) (6) provides, as follows:

### Section 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

\*                    \*                    \*                    \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing–

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial

## Collateral Estoppel Effect of the State Court Judgment[6]

3.  Collateral estoppel is a doctrine of preclusion created to "foreclose [ ] the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir.1998) (internal quotation

---

condition;

> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

> (iv) that the debtor caused to be made or published with intent to deceive[.]

>                  *                  *                  *                  *

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

>                  *                  *                  *                  *

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).

[6]The issue before the Court can be broken down into two parts: (1) whether the fraud judgment entered against the debtors in the Circuit Court for Howard County is nondischargeable on its face; and therefore (2) whether the debtors are collaterally estopped from contesting its status as such in the bankruptcy court.

marks and citation omitted).  In order for collateral estoppel to apply, the "proponent

must demonstrate that (1) the issue or fact is identical to the one previously litigated;

(2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact

was critical and necessary to the judgment in the prior proceeding; (4) the judgment

in the prior proceeding is final and valid; and (5) the party to be foreclosed by the

prior resolution of the issue or fact had a full and fair opportunity to litigate the issue

or fact in the prior proceeding."  *Kloth v. Microsoft Corp. (In re Microsoft Corp.*

*Antitrust Litig.)*, 355 F.3d 322, 326 (4th Cir. 2004); *see also Baron Financial Corp*

*v. Natanzon*, 509 F. Supp.2d 501, 524 n. 39 (D. Md. 2007); *Simpson v. SunTrust*

*Mortgage, Inc. (In re Hurst)*, ___ B.R. ___, 2009 WL 553620 (Bankr. D. Md. Feb. 26,

2009).

    4.  Collateral estoppel is applicable to dischargeability proceedings.  *Grogan*

*v. Garner*, 498 U.S. 279, 285, n. 11, 111 S.Ct. 654, 658, n. 11, 112 L. Ed.2d 755, 763

n. 11 (1991) ("We now clarify that collateral estoppel principles do indeed apply in

discharge exception proceedings pursuant to § 523(a)."); *see also Combs v.*

*Richardson*, 838 F.2d 112, 116 (4th Cir. 1988) (finding collateral estoppel to apply

to hold state court jury verdict for assault nondischargeable, but stating that "[i]n

determining whether collateral estoppel applies to bind a party to a jury's earlier

17

verdict, the federal policies underlying discharge and its statutory exceptions require that the conditions necessary for issue preclusion be addressed with special care.").

5.  In the instant case, the trial in the state court resulted in the equivalent of a default judgment against the debtors, where the McClendons filed a general denial but failed to appear at trial and judgment was entered against them based upon an uncontested presentation of facts by Gulati.

6.  There are numerous reasons why collateral estoppel might not apply  to a state court judgment that was entered where the debtor filed an answer but did not appear at trial.  *M&M Transmissions, Inc. v. Raynor (In re Raynor)*, 922 F.2d 1146, 1149 (4th Cir. 1991) ("To preclude a debtor from litigating an issue dispositive of discharge, the record of the case giving rise to the judgment debt must show that the issue was actually litigated and determined by a final valid judgment in an earlier proceeding and that it was necessary to the decision.").[7]

---

[7]In *Raynor,* an automobile repair company had sued the debtor in state court for fraud based on his alleged role selling old automobile repair equipment as new and representing that he owned the equipment when it had in fact been leased.  *Raynor*, at 1150 (Niemeyer, J., dissenting).  He retained a lawyer, who negotiated a settlement agreement which eventually failed.  *Id.*  The case went to trial, but the debtor's lawyer was unable to contact him and withdrew his appearance, without ever having filed an answer.  *Id.*  After hearing testimony and receiving evidence, the state court found the debtor liable for fraud and issued a 15-page opinion detailing its findings.  The debtor hired an attorney who filed a motion to vacate the judgment, which the state court denied.  *Id.* at 1151.  The debtor then filed bankruptcy and the automobile repair company sued again, seeking to use collateral estoppel to hold the state court

7.  Some bankruptcy courts in the Fourth Circuit have declined to apply collateral estoppel to judgments that were entered after minimal "actual litigation." *See Lamar v. Loevner (In re Loevner)*, 163 B.R. 764, 766 (Bankr. E.D. Va. 1994) (state court consent judgment issued without findings of fact would not support collateral estoppel); *Kulesa v. Stankovich (In re Stankovich)*, 171 B.R. 27, 29 (Bankr. E. D. Va. 1994) (state court judgment for fraud entered when defendant had filed general denial but had not replied to requests for admission would not support collateral estoppel); *Outlaw v. Cuffey (In re Cuffey)*, 162 B.R. 469, 470-71 (Bankr.

_____

judgment non-dischargeable.  The Fourth Circuit reversed the bankruptcy court's grant of summary judgment to the automobile repair company and held that "[b]ecause the issue of fraud was not actually litigated, [the automobile repair company] cannot invoke the default judgment to bar Raynor's discharge by relying on res judicata or issue preclusion." *Id.* at 1150.  The Fourth Circuit emphasized the debtor did not have the opportunity to cross examine witnesses in the state court. *Id.* at 1149.  After *Raynor,* several courts have applied collateral estoppel to situations where a debtor filed an answer in the state court litigation but did not appear or present a defense at trial.  In *Ramsey v. Bernstein (In re Bernstein)*, 197 B.R. 475 (Bankr. D. Md. 1996), this Court (Derby, J.), held that collateral estoppel precluded relitigation of a state court judgment for an improper arrest by a bail bondsman when the bail bondsman had filed an answer, and the state court held a jury trial at which the bail bondsman did not appear.  Similarly, in *Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17 (4th Cir. 1997), the Fourth Circuit held that collateral estoppel applied when a state court issued a default judgment based on a debtor's dilatory trial tactics. However, *see Lawrence Steel Erection Co. v. Piercy (In re Piercy)*, 140 B.R. 108, 113 (Bankr. D. Md. 1992), this Court (Derby, J.) held that collateral estoppel did not apply when an uncontested state court judgment for fraudulent misappropriation of funds under the Maryland Construction Trust Act was entered after a hearing.

19

E.D. Va. 1993) (state court judgment for legal malpractice entered after trial which debtor did not attend would not support collateral estoppel).

8.  With reference to whether a state court judgment entered by default must be given collateral estoppel effect in a bankruptcy proceeding to determine nondischargeability, the Fourth Circuit held in *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008), that the bankruptcy court must determine whether state law would give the judgment preclusive effect.  *Sartin* held that the North Carolina law of collateral estoppel should be applied to a North Carolina judgment that the state court entered by default as a discovery sanction.

9.  Therefore, in order to determine whether collateral estoppel applies to the judgment entered by the Circuit Court for Howard County, this Court must determine (1) whether the issue of fraud was litigated in the state court; (2) if so, whether the state court finding of fraud was the same as that required under the Bankruptcy Code to determine the debt to be nondischargeable; and (3) whether the law of Maryland would give preclusive effect to the judgment.

10.  Maryland courts have held that a default judgment "constitutes an admission by the defaulting party of its liability for the causes of action set out in the complaint." *Pac. Mortgage & Inv. Group, Ltd. v. Horn*, 100 Md. App. 311, 332, 641 A.2d 913, 923 (1994); *see also Porter Hayden Co. v. Bullinger*, 350 Md. 452, 472,

20

713 A.2d 962, 971 (1998); *Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 434, 653 A.2d 934, 945 (1995); and *Gotham Hotels, Ltd. v. Owl Club, Inc. of Balto.*, 26 Md. App. 158, 173, 337 A.2d 117, 125 (1975).

11. Maryland law affords the same collateral estoppel effect to matters litigated at an uncontested trial as to a contested hearing.   The judgment of the circuit court recited that "by clear and convincing evidence, the Plaintiff established each and every element of a claim for fraud, as well as each and every element of a claim of concealment." Plaintiff's Ex. No. 5.  The record of the state court proceeding is silent as to whether the issues determined there are identical to those tried here.  Collateral estoppel is not appropriate when a finding of nondischargeability requires the proof of an element not litigated in an earlier proceeding. *See Wilcoxon Constr., Inc. v. Woodall (In re Woodall)*, 177 B.R. 517, 521 (Bankr. D. Md. 1995) (Keir, J.).

12.   The state court judgment did not furnish a factual basis for the determination of nondischargeable fraud.   The mere concealment of a debtor's financial condition does not give rise to an action for nondischargeability of debt, absent a written misrepresentation.

13.   The state court judgment did not set forth a basis for finding that the debtors possessed a "present intention" not to repay the plaintiff at the time of the loan. The sole allegation that was undisputably proven in the state court lawsuit was

21

the claim for breach of contract, the count that Gulati included in the first complaint that he filed *pro se*.  Damages based on a bare breach of contract are dischargeable in bankruptcy.  Accordingly, the debtors were not collaterally estopped from contesting this action.

### Section 523(a)(2)(A)

14.  With respect to Section 523(a)(2)(A), the plaintff must show that he was induced to lend money by  false pretenses, a false representation, or actual fraud.  11 U.S.C. § 523(a)(2)(A).  The terms "false pretenses, a false representation, or actual fraud" are to be interpreted according to their common law meaning at the time the Bankruptcy Code was enacted.  *Field v. Mans*, 516 U.S. 59, 70, 116 S. Ct. 437, 133 L. Ed.2d 351 (1995); *see also Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999).  Therefore, in order to maintain an action under Section 523(a)(2)(A), a plaintiff must show, by a preponderance of the evidence, that "(1) the defendant made a representation; (2) the defendant knew at the time she made the representation that it was false; (3) the defendant made the representation with the intent and purpose to deceive the plaintiff; (4) the plaintiff justifiably relied on the false representation; and (5) the plaintiff suffered damages as a proximate result of the representation."  *Guar. Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 371-72 (Bankr. D. Md. 2005); *see also Spinoso v. Heilman (In re Heilman)*, 241 B.R.

137, 150 (Bankr. D. Md. 1999). "[T]he fraud must have existed at the time of, and been the methodology by which, the money, property or services were obtained... Later misrepresentations are irrelevant for purposes of determining dischargeability under Section 523(a)(2)(A)." *Heilman*, 241 B.R. at 150.

15.  While intent to deceive may be inferred from "the circumstances, including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them," *Koep*, 334 B.R. at 372 (*citing Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999), there is no evidence in the record of the instant case to indicate that the debtors did not intend to repay Gulati at the time that they contracted with him.  Despite their poor financial history, the debtors repaid their other debts to Gulati, including their obligation under the listing agreement and the $4,500 loan.  Regardless of whether the listing agreement superseded the equity participation contract, it was not unreasonable for unsophisticated borrowers such as the McClendons to assume that their payment of the real estate commission to Dream satisfied their debt to the plaintiff under the earlier contract.  Indeed, their attempt to pay Gulati through the listing agreement demonstrated their concern that he should receive compensation.

16.  Gulati cannot show justifiable reliance, an essential element of any action under Section 523(a)(2)(A).[8]  Gulati stated repeatedly that he performed no due

---

[8]In *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed.2d 351 (1995), the Supreme Court adopted the view of the Restatement of Torts 2d, and stated that:

> . . . The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required.  The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation."  Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage.  The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort.  Here a contrast between a justifiable and reasonable reliance is clear:  Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man.  Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  Justifiability is not without some limits, however. As a comment to § 541 explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.  Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.  On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the

diligence regarding the debtors' financial condition, even though he was on notice regarding their problems, from their cashing out over $40,000 on the Germantown Property to their inability to make a down payment on the Laurel Property.[9]

17.  Gulati was a sophisticated real estate investor and broker who should have known that it was necessary for him to investigate his clients' financial history.  *See Koep*, 334 B.R. at 372 ("Reliance by the plaintiff is also based on the circumstances of the particular case."); *see also Boyd v. Loignon (In re Loignon)*, 308 B.R. 243, 249 (Bankr. M.D. N.C. 2004) ("To prove justifiable reliance, a creditor must show some degree of diligence in determining creditworthiness, but not that degree of diligence that a reasonable person would use.").  Because the plaintiff performed no investigation at all and disregarded obvious evidence of the debtors' inability to pay,

---

use of his senses.  Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."  A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

*Field*, 516 U.S. at 70-71, 116 S. Ct. at 444, 133 L. Ed. 2d at 362 (internal citations and footnotes omitted).

[9] Inability to make a down payment is considered by the Federal Housing Authority ("FHA") to be evidence of lack of creditworthiness.  *See* 12 U.S.C. § 1709(b)(9), which requires a down payment for all loans which are insured by FHA, and specifically forbids down payment loans from any entity that financially benefits from the transaction.  The bank loans in this case appear to be uninsured.  Plaintiff's Ex. No. 18, line 3.

he cannot prove that he justifiably relied on any alleged misrepresentations or omissions made by them.

### Section 523(a)(2)(B)

18.  The plaintiff cannot prevail under Section 523(a)(2)(B), which requires that  a materially false statement be made by the debtors, *in writing*, respecting their financial condition.  It is well established that only written statements of financial condition give rise to an action under Section 523(a)(2)(B).  *Blackwell v. Dabney (In re Dabney)*, 702 F.2d 490, 491 (4th Cir. 1983); *see also Arrow Concrete Co. v. Bleam (In re Bleam),* 356 B.R. 642, 647 (Bankr. D. S.C. 2006).  There is no evidence of any such written statement having been presented to the plaintiff by the defendants respecting their financial condition.

19.  As indicated *supra*, the plaintiff cannot prove reasonable reliance, also required by Section 523(a)(2)(B)(iii).  *See Citizens Bank of Md. v. Broyles (Matter of Broyles)*, 55 F.3d 980, 983 (4th Cir. 1995), *citing Cadle Company, Inc. v. Spilotros (In re Spilotros)*, 117 B.R. 691, 692-93 (M.D. Fla.1990) ("All elements, including reasonable reliance, must be proven by Plaintiff for a debt to be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B)."). While the debtors never

26

disclosed to Gulati the details of their checkered financial past, Gulati never conducted

any due diligence and did not inquire as to their financial history.[10]

20.  The debtors made no oral misrepresentation to Gulati.  They informed him

of their occupations and where they were employed, including the fact that Mr.

McClendon was a pastor.  Both statements were true.  Therefore, Gulati cannot

proceed under 11 U.S.C. § 523(a)(2)(B).

21.  The plaintiff's allegations of fraudulent conduct against the debtors are not

supported by the evidence.  His allusion to the debtors' financial history, to Mr.

McClendon's conviction for credit card fraud and the unsubstantiated accusation that

Mr. McClendon fraudulently received disability payments, among other statements,

are insufficient to prove fraudulent intent.

### Section 523(a)(4)

22.  The plaintiff's claim of nondischargeability pursuant to Section 523(a)(4)

requires proof by a preponderance of the evidence of "fraud or defalcation while

acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).

---

[10]Gulati had no reason to be concerned that the debtors could not afford to maintain
the mortgage on the Laurel Property.  In the ever-appreciating market for residential
real estate that existed in 2003, he stood to make a profit regardless of their
creditworthiness.  In fact, the likelihood of his turning a profit on the equity
participation agreement depended upon their inability  to maintain the payments on
the mortgage, thereby requiring them to liquidate the asset and pay him his share of
the equity under the agreement.

There is no evidence before the Court that the debtors were acting in a fiduciary capacity in their dealings with the plaintiff or that they committed embezzlement or larceny. There was no proof of the existence of a partnership which might have given rise to fiduciary duties. *See Miller v. Salabes*, 225 Md. 53, 55, 169 A.2d 671 (1961). ("The existence of a partnership will not be presumed, but must be proved").

23. "The burden of proving a partnership is upon the party who asserts it." *LaRoque v. LaHood*, 93 Md. App. 625, 643, 613 A.2d 1033 (1992), *cert. denied*, 329 Md. 337, 619 A.2d 546 (1993). Maryland law states that "the unincorporated association of two or more persons to carry on as co-owners a business for profit forms a partnership." Md. Code, Corps. & Assocs. § 9A-202. Section 9A-202(3)(v) provides that "A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment... (v) of interest or other charge on a loan, even if the amount of payment varies with the profits of the business, including a direct or indirect present or future ownership of the collateral, or rights to income, proceeds, or increase in value derived from the collateral..." *Id*. This section is based on the Uniform Partnership Act. Comment three to Section 202 of the Uniform Partnership Act explains that "The purpose of [the language in Part v] is to protect shared-appreciation mortgages, contingent or other variable or performance-related mortgages, and *other equity participation*

28

*arrangements* by clarifying that contingent payments do not presumptively convert lending arrangements into partnerships."   Uniform Partnership Act 1997 § 202, comment 3 (emphasis added).

24.  The Court finds that the arrangement between Gulati and the McClendon was one of lender and borrower, not of partners.  Therefore, no fiduciary duty arose the breach of which could give rise to nondischargeability under Section 523(a)(4).

### Section 523(a)(6)

25.  The last ground for relief is made pursuant to Section 523(a)(6), which prohibits the discharge of debts owing "for willful and malicious injury by the debtor to another entity or to the property of another entity."   The plaintiff claims that the debtors' refusal to pay him his share of the equity from the Laurel Property at closing amounted to the intentional tort of conversion.  Assuming that the contract between the parties gave rise to an equity interest under Maryland law sufficient to support a claim for conversion,[11] Gulati has not satisfied the necessary requirements to hold the debt nondischargeable under Section 523(a)(6).   "[N]ot every tort judgment for conversion is exempt from discharge."  *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S. Ct. 974, 978, 140 L. Ed.2d 90 (1998), *citing Davis v. Aetna Acceptance Co.*, 293

---

[11]Whether or not an unrecorded agreement could give Gulati the right to claim an equity interest in the Laurel Property is uncertain.  *See* Md. Real Prop. Code Ann., § 3-101.

U.S. 328, 55 S.Ct. 151, 79 L. Ed. 393 (1934) ("But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances.   There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice."); *see also First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995) ("Although a person need not know that someone else has superior ownership rights in the property to be technically liable for the tort of conversion," the test for malice set forth in the case of *St. Paul Fire & Marine. Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009 (4th Cir. 1985) "requires such knowledge on the debtor's part before discharge will be denied – in other words, the debtor must have engaged in a 'wrongful' conversion.") (internal citations omitted).

26.  The debtors' mistaken belief that the money they paid Dream pursuant to the listing agreement satisfied the debt owed Gulati from the equity participation agreement, tended to show that they did not intend to harm the plaintiff.

27.  Likewise, the debtors' reasonable belief in the unenforceability of the equity participation agreement mitigates if not negates the element of willfulness required by the plaintiff to prove an exception to discharge pursuant to Section 523(a)(6).

30

WHEREFORE, the debts alleged to be owed to the plaintiff are dischargeable pursuant to 11 U.S.C. § 727 and no exception under 11 U.S.C. § 523 applies.

***ORDER ACCORDINGLY.***

cc:     John J. Murphy, III, Esquire
       Walker & Murphy, LLP
       1700 Rockville Pike, Suite 400
       Rockville, Maryland  20852
       Counsel for Plaintiff

       Marc L. Jordan, Esquire
       7370 Grace Drive, Suite 101
       Columbia, Maryland  21044-2470
       Counsel for Defendants

       Monique D. Almy, Esquire
       Crowell & Moring
       1001 Pennsylvania Avenue, N.W., 10th Fl.
       Washington, D.C.  20004-2595
       Chapter 7 Trustee

       Office of the U.S. Trustee
       U.S. Courthouse
       101 W. Lombard Street, Suite 2625
       Baltimore, Maryland  21201